## Docket No. 13-30221

*In the*

# United States Court of Appeals

*For the*

# Fifth Circuit

In re DEEPWATER HORIZON – APPEALS OF THE
MEDICAL BENEFITS CLASS ACTION SETTLEMENT

MIKE STURDIVANT, PATRICIA STURDIVANT, SUSAN FORSYTH
and JAMES H. KIRBY, IV,

*Claimants-Appellants,*

MEDICAL BENEFITS SETTLEMENT CLASS,

*Plaintiff-Appellee,*

v.

BP EXPLORATION & PRODUCTION, INCORPORATED and
BP AMERICA PRODUCTION COMPANY,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the Eastern District of Louisiana,
No. 2:10-md-02179-CJB-SS · Honorable Carl J. Barbier*

## BRIEF OF APPELLANTS

JOSEPH DARRELL PALMER, ESQ.
LAW OFFICES OF DARRELL PALMER PC
603 North Highway 101
Suite A
Solara Beach, California 92075
(858) 792-5600 Telephone
(866) 583-8115 Facsimile

*Attorney for Appellants,
Mike Sturdivant, Patricia Sturdivant,
Susan Forsyth and James H. Kirby, IV*

 

# CERTIFICATE OF INTERESTED PERSONS

In re DEEPWATER HORIZON – APPEALS OF THE
MEDICAL BENEFITS CLASS ACTION
SETTLEMENT,

MIKE STURDIVANT; PATRICIA STURDIVANT;
SUSAN FORSYTH; JAMES H. KIRBY, IV,
*Claimants-Appellants*,

v.

BP EXPLORATION & PRODUCTION,
INCORPORATED; BP AMERICA PRODUCTION
COMPANY,
*Defendants-Appellees*,                              No. 13-30221

_____

REYNALDO ABREU; ADONAY APARECIO; MIGUEL
ARELLANO,
*Claimants-Appellants*,

MEDICAL BENEFITS SETTLEMENT CLASS
*Plaintiff-Appellee*

v.

BP EXPLORATION & PRODUCTION,
INCORPORATED; BP AMERICA PRODUCTION
COMPANY,
*Defendants-Appellees*,

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Mike Sturdivant

2. Patricia Sturdivant

3. Susan Forsyth

4. James H. Kirby, IV

   The following attorney represents Claimant-Appellants 1, 2, 3 and 4:
   Joseph Darrell Palmer
   Law Offices of Joseph Darrell Palmer
   Suite A
   603 N. Highway 101
   Solana Beach, CA 92075-0000

5. Reynaldo Abreu

6. Adonay Aparecio

7. Miguel Arellano

   The following attorneys represent Claimant-Appellants 5, 6 and 7:
   Jason Luke Melancon
   Melancon Rimes
   Suite A
   8706 Jefferson Highway
   Baton Rouge, LA 70809-0000

   Jeremy D. Friedman
   Downs Law Group, P.A.
   Suite 307
   3250 Mary Street
   Coconut Grove, FL 33133

8. The Medical Benefits Settlement Class (defined as all individuals who resided in the United States as of April 16, 2012 and who either: were "clean-up workers" between April 20, 2010 and April 16, 2012; or Resided in "Zone A" (specified beachfront areas) for some time on each of at least sixty days  between April 20, 2010 and September 30, 2010 ("Zone A Resident"), and have had a "Specified Physical Condition" prior to September 30, 2010; or Resided in "Zone B" (specified wetlands) for some time on at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident")).

The following attorneys represent Appellee 8:
Stephen Jay Herman
Soren E. Gisleson
Herman Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, LA 70113-0000

Robin Lynn Greenwald
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003

Matthew Edward Lundy
Lundy, Lundy, Soileau & South, L.L.P.
501 Broad Street
Lake Charles, LA 70601-0000

James Parkerson Roy
Domengeaux, Wright, Roy & Edwards
Suite 500
556 Jefferson Street
Lafayette, LA 70501-0000

9.  BP Exploration & Production, Incorporated.

10. BP America Production Company

The following attorneys represent Appellees 9 and 10:

Andrew Baker Bloomer
Timothy A. Duffy
Richard Cartier Godfrey
James Andrew Langan
Elizabeth A. Larsen
Kirkland & Ellis, L.L.P.
38th Floor
300 N. LaSalle Street
Chicago, IL 60654

Robert C. Mike Brock
Covington & Burling, L.L.P.
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-0000

Jeffrey Bossert Clark, Sr.
Steven Andrew Myers
Kirkland & Ellis, L.L.P.
655 15th Street, N.W.
Washington, DC 20005-0000

Ethan Peter Keith Greene
James Peter Joseph, I,
Arnold & Porter, L.L.P.
555 12th Street, N.W.
Washington, DC 20004-0000

Don Keller Haycraft
Liskow & Lewis, P.L.C.
Suite 5000
701 Poydras Street
1 Shell Square
New Orleans, LA 70139-5099

Ellen K. Reisman
Arnold & Porter, L.L.P.
44th Floor
777 S. Figueroa Street
Los Angeles, CA 90017-5844

/s/ Joseph Darrell Palmer
Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA 92075
Phone: (858) 792-5600
Fax: (858) 792- 5655
Darrell.palmer@palmerlegalteam.com

Attorney for Objector-Appellants Mike and
Patricia Sturdivant, Susan Forsyth, and
James H. Kirby IV

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Mike and Patricia Sturdivant, Susan Forsyth and James H. Kirby IV respectfully request oral argument. This appeal involves important issues at the intersection between class action certifications, class action settlements and complex mass tort litigation. Oral discussion of the facts and the applicable precedent would benefit the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ vi

TABLE OF CONTENTS......................................................................... vii

TABLE OF AUTHORITIES ................................................................... ix

Statement of Subject Matter and Appellate Jurisdiction .........................................1

Statement of the Issues...........................................................................1

Statement of the Case...........................................................................3

Statement of the Facts...........................................................................4

    A.    The Deepwater Horizon disaster .........................................................4

    B.    The Complaint and Settlement.........................................................6

    C.    The Sturdivant Appellants object and the court overrules
           the objection .........................................................9

Summary of Argument...........................................................................10

Argument...........................................................................14

I.    The Certification of the Medical Benefits Settlement Class under Fed. R.
    Civ. P. 23(b)(3) was error ...............................................................14

    A.    Commonality Is Absent...............................................................15

    B.    Predominance Is Absent ...............................................................19

    C.    Adequacy and Typicality Are Absent ...............................................26

          1.    There Exists an Intra-Class Conflict Between Exposure-Only
                Class Members and Those Already Manifesting Injuries...............30

          2.    The Upside-Down Class Representative Selection Procedure
                Undermined Adequacy and Led to a Settlement
                Favoring the PSC. ...............................................................33

    D.    Superiority is Absent...............................................................39

II.    Preferring *Cy Pres* Recipients to Class Members Is Impermissible .............44

CONCLUSION ...............................................................51

CERTIFICATE OF SERVICE ...............................................................53

CERTIFICATE OF COMPLIANCE  WITH FED. R. APP. 32(a)(7)(C)
    AND CIRCUIT RULE 32-1 ..........................................................54

# TABLE OF AUTHORITIES

<u>Cases</u>

*Accord Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) .................................. 10, 19, 20, 21, 22, 23, 41

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................*passim*

*Bell Atl. Corp. v. AT&T Corp.*,
    3339 F.3d 294 (5th Cir. 2003) .....................................................14

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ...................................................27, 34

*Braud v. Transp. Servs. of Ill.*,
    2009 U.S. Dist. LEXIS 66400 (E.D. La. July 22, 2009) ...............24

*Broussard v. Meineke Disc. Muffler Shops*,
    155 F.3d 331 (4th Cir. 1998) .......................................................47

*Buettgen v. Harless*,
    263 F.R.D. 378 (N.D. Tex. 2009)..................................................34

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ..................................................*passim*

*Comcast Corp., v. Behrend*,
    133 S.Ct. 1426 (2013).................................................................21

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ......................................44, 48, 49, 50

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002)........................................................................1

*Georgine v. Amchem Prods.*,
    83 F.3d 610 (3d Cir. 1996) ........................... 17, 20, 22, 23, 39, 42

*Hansberry v. Lee*,
    311 U.S. 32 (1940)........................................................26

*Ibarra v. Texas Employment Comm'n,*
    823 F.2d 873 (5th Cir.1987) ....................................15

*In re Am. Medical Sys.,*
    75 F.3d 1069 (6th Cir. 1996) .............................20, 26

*In re Aqua Dots Prod. Liab. Litig.,*
    654 F.3d 748 (7th Cir. 2011) .............................35, 43

*In re Asbestos Litig.,*
    90 F.3d 963 (5th Cir. 1996) ...............................17, 27

*In re Baby Prods. Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013) ................13, 14, 48, 49

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) .........13, 35, 36, 51

*In re Community Bank of N. Va. & Guar. Nat'l Bank of Tallahassee
    Second Mortg. Loan Litig.,*
    418 F.3d 277 (3d Cir. 2005) ..................................37

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    216 F.R.D. 197 (D. Me. 2003).................................49

*In re Fibreboard Corp.,*
    893 F.2d 706 (5th Cir. 1990) ...............................11, 33

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ..............................11, 36, 37

*In re Hotel Tel. Charges,*
    500 F.2d 86 (9th Cir. 1974) ....................................43

*In re Katrina Canal Breaches Litig.,*
    628 F.3d 185 (5th Cir. 2010) ...............10, 14, 33, 37, 49

*In re Monster Worldwide, Inc. Secs. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) .................................................................34

*In re Monumental Life Ins. Co.*,
    365 F.3d 408 (5th Cir. 2004) .......................................................................40

*In re Pet Foods Prod. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010) ........................................................................51

*In re TD Ameritrade Accountholder Litig.*,
    266 F.R.D. 418 (N.D. Cal. 2009) ................................................................13

*In re Thornburg Mortg., Inc. Secs. Litig.*,
    885 F. Supp. 2d 1097 (D.N.M. 2012) ..........................................................51

*In re Vioxx Prods. Liab. Litig.*,
    MDL No. 1657, 239 F.R.D. 450 (E.D. La. 2006) ........................................25

*Johnson v. Comerica*,
    83 F.3d 241 (8th Cir. 1996) .........................................................................36

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ...............................................................*passim*

*Lane v. Facebook, Inc.*,
    709 F.3d 791 (9th Cir. 2013) .......................................................................46

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) ....................................................14, 17, 27, 30

*Literary Works in Electronic Databases Copyright Litig. v. Thomson Corp.*,
    654 F.3d 242 (2d Cir. 2011) ........................................................................28

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2000) .....................................................................38

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ...................................................................35

*Louisiana ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) .....................................................................11

*M.D. v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ........................................................14, 15, 16, 18

*Madison v. Chalmette Ref., L.L.C.*,
    637 F.3d 551 (5th Cir. 2011) .................................................10, 14, 21, 24, 39

*Mandujano v. Basic Vegetable Prods., Inc.*,
    541 F.2d 832 (9th Cir. 1976) ........................................................................48

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ........................................................................48

*Mullen v. Treasure Chest Casino, L.L.C.*,
    186 F.3d 620 (5th Cir. 1999) ........................................................................15

*Nachshin v. AOL*,
    663 F.3d 1034 (9th Cir. 2011) ......................................................................48

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)............................................................................*passim*

*Pettway v. Am. Cast Iron Pipe Co.*,
    576 F.2d 1157 (5th Cir. 1978) ......................................................................38

*Radcliffe v. Experian Info. Solutions*,
    __F.3d__, No. 11-56376, 2013 U.S. App. LEXIS 7932
    (9th Cir. Apr. 22, 2013) ........................................................................27, 35

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ........................................................................27

*Robertson v. Monsanto Co.*,
    287 Fed. Appx. 354 (5th Cir. 2008) ........................................................41, 42

*Robinson v. Tex. Auto. Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ........................................................................39

*Rutstein v. Avis Rent-A-Car Sys.*,
    211 F.3d 1228 (11th Cir. 2000) ....................................................................40

*Strong v. BellSouth Telecomms.*,
    137 F.3d 844 (5th Cir. 1998) ...........................................................13, 14, 36

*Turner v. Murphy Oil USA, Inc.*,
    234 F.R.D. 597 (E.D. La. 2006) .............................................................24, 25

*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) .........................................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
    135 S. Ct. 2541 (2011)................................................... 10, 15, 16, 18, 19, 35

*Watson v. Shell Oil Co.*,
    979 F.2d 1014 (5th Cir. 1992) ......................................................................24

*Weinberger v. Great N. Nekoosa Corp*,
    925 F.2d 518 (1st Cir. 1991)..........................................................................35

<u>Rules and Statutes</u>

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1333 ..................................................................................................1

28 U.S.C. § 1407 ..................................................................................................3

46 U.S.C. § 30101 ................................................................................................1

Fed. R. App. Proc. 4(a)(1)(A) .............................................................................1

Fed. R. Civ. Proc. 23 ...............................................................................9, 10, 14

Fed. R. Civ. Proc. 23(a) ...........................................................9, 11, 15, 39, 44

Fed. R. Civ. P. 23(a)(1)......................................................................................15

Fed. R. Civ. P. 23(a)(2).............................................................................2, 15, 20

Fed. R. Civ. P. 23(a)(3)..............................................................................2, 26

Fed. R. Civ. P. 23(a)(4)........................................................................2, 26, 30

Fed. R. Civ. P. 23(b) ...................................................................9, 11, 44

Fed. R. Civ. P. 23(b)(3).................................................................*passim*

Fed. R. Civ. P. 23(c)(4)(B) .................................................................29

Fed. R. Civ. P. 23(e)(2) .....................................................................4, 9

Fed. R. Civ. 23(g)(4) ...........................................................................27

Fed. R. Civ. Proc. 23(h) ........................................................................9

Fed. R. Civ. P. 23(h)(2)..........................................................................4

Fed. R. Civ. Proc. 58 ..............................................................................1

<u>Other Authorities</u>

AMERICAN LAW INSTITUTE,
        PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 (2010) ............2, 47, 49

Art. III, § 2 ...........................................................................................2

Brickman , Lester, *Lawyer Barons* 522-25 (2011) ....................................36

Coffee Jr., John C., *Class Wars: The Dilemma of the Mass Tort
        Class Action*, 95 COLUM. L. REV. 1343 (1995)..............................................32

*Court Awarded Attorney Fees*, Report of the Third Circuit Task Force,
        108 F.R.D. 237 (1985) ...................................................................38

Feldman, Martin L.C., *Predominance and Products Liability Class Actions:
        An Idea Whose Time Has Passed?*, 74 TUL. L. REV. 1621 (2000..................25

Grimmelmann , James, *Future Conduct and the Limits of Class Action
        Settlements*, 91 N.C. L. REV. 387 (2013) ......................................30

Hensler, Deborah R., *Has the Fat Lady Sung? The Future of Mass
        Toxic Torts*, 26 REV. LITIG. 883 (2007) ..........................................25

MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.612 .........................................28

MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.71 ............................................37

Nagareda , Richard, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. REV. 97 (2009) ........................................................................29

Redish, Martin H., Julian, Peter, & Zyontz, Samantha, *Cy Pres Relief and
    the Pathologies of the Modern Class Action: A Normative and
    Empirical Analysis*, 62 FLA. L. REV. 617 (2010) ..............................46, 48, 51

Rothman , Alexandra N., *Note: Bringing an End to the Trend: Cutting
    Judicial "Approval" and "Rejection" out of Non-Class Mass
    Settlement*, 80 FORDHAM L. REV. 319 (2011) ................................................25

Silver , Charles, *Due Process and the Lodestar Method*,
    74 TUL. L. REV. 1809 (2000) ........................................................................36

Tidmarsh , Jay, *Superiority as Unity*, 107 NW. L. REV. 565 (2013) .................39, 42

Voigt, Eric P., *A Company's Voluntary Refund Program for Consumers
    Can be a Fair and Efficient Alternative to a Class Action*,
    31 REV. LITIG. 617 (2012) ............................................................................43

Willging, Thomas E. & Lee III, Emery G., *From Class Actions
    to Multidistrict Consolidations: Aggregate Mass-Tort Litigation
    after Ortiz*, 58 U. KAN. L. REV. 775 (2010) ..................................................25

## Statement of Subject Matter and Appellate Jurisdiction

The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1333, and the Admiralty Extension Act, 46 U.S.C. § 30101, because the plaintiffs' complaint alleges claims of admiralty and maritime law. Constitutional jurisdiction is grounded in Art. III, § 2.

The court's final judgment, pursuant to Fed. R. Civ. Proc. 58, issued on January 11, 2013. [10-02179, Dkt. 8218][1] Class members and objectors Mike and Patricia Sturdivant, Susan Forsyth, and James H. Kirby IV ("the Sturdivant Appellants"), filed a notice of appeal on January 17, 2013. [8271]. This notice is timely under Fed. R. App. P. 4(a)(1)(A).

This court has appellate jurisdiction because this is a timely-filed appeal from a final judgment under 28 U.S.C. § 1291. The Sturdivant Appellants as class-member objectors who filed a timely objection to settlement approval [7233 and 10-7777 Dkt. 124], have standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## Statement of the Issues

1.    This Circuit has repeatedly held that a class bringing personal-injury claims cannot be certified because, *inter alia*, individualized issues predominate

---

[1] All references to the bracketed doc #'s refer to docket numbers from 10-md-2179, followed by relevant page numbers or § if applicable. References to docket numbers from other related cases will be preceded by the case number.

over common ones. Did the district court err as a matter of law in certifying a settlement class arising out of a mass tort alleging personal-injury claims under Fed. R. Civ. P. 23(b)(3)?

1a.    Did the district court wrongly conclude that the class satisfied the Rule 23(a)(2) prerequisite of commonality?

1b.    Did the district court wrongly conclude that the class satisfied the Rule 23(b)(3) prerequisite of predominance?

1c.    Did the district court wrongly conclude that the class satisfied the Rule 23(a)(3) and (a)(4) prerequisites of typicality and adequacy of representation?

1d.    Did the district court wrongly conclude that certifying a class would be a superior means of resolution of the litigation, as Rule 23(b)(3) requires, when there already existed a compensation mechanism, litigation is both viable and will not be foreclosed by the settlement, and numerous mass torts have been largely resolved with opt-in settlements without the potential unfairness of class waivers?

2.    "The settlement-fund proceeds, having been generated by the value of class members, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing American Law Institute, Principles of the Law of Aggregate Litig. ("ALI Principles) § 3.07 cmt. b (2010)). Did the district court mistakenly conclude that principles of *cy pres* doctrine as discussed in *Klier* had no application to the settlement's $105 million Gulf Region Outreach Program, which prioritizes the claims of an unrelated third party over class members who are required to compromise their claims?

2

## Statement of the Case

The Deepwater Horizon Incident gave rise to hundreds of lawsuits. [8217 at 2]. On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1407. *In re Oil Spill of the Oil Rig "Deepwater Horizon" In the Gulf of Mexico On April 20, 2010*, MDL No. 2179, 731 F.Supp.2d 1352 (J.P.M.L. 2010). On March 2, 2012, soon before the Phase One Trial was scheduled to begin on a limited set of issues, the Plaintiffs Steering Committee ("PSC") and BP defendants reached agreements in principle on two settlements, include the one at issue here for a previously uncertified medical benefits personal injury class. *See* Medical Benefits Settlement ("Settlement") [6427-1]. For the sole purpose of effectuating the medical class settlement that they reached with BP, PSC filed a putative class complaint on behalf of the medical class on April 16, 2012. [12-00968, Dkt. 1]. Two days later, the PSC and BP filed the proposed Medical Settlement. [6273] The district court granted preliminary approval and certification on May 2, 2012. [6419].

The settlement designated agreement on fees as a "material term and condition precedent" to the consummation of the agreement [Dkt. 6427-1, Settlement § XIX). The parties asserted that they did not commence fee negotiations until April 17, 2012 after the district court gave its consent. [6427-21 at ¶1]. If accurate, then fee negotiations took a single day, as the fee compact was finalized on April 18. *Id*. As of the time of final approval, the PSC had still not

filed a formal motion for fees, to which class members are entitled to object under Fed. R. Civ. P. 23(h)(2). [8217 at 19].

150 persons and entities, including the Attorney General of Louisiana, filed objections to final approval of the settlement. *Id.* at 69. On November 8, 2012, the district court held a final fairness hearing pursuant to Fed. R. Civ. P. 23(e)(2). On January 11, 2013, the district court overruled these objections in an Order and Reasons for granting final approval of the medical benefits class settlement. *Id.* Final judgment issued the same day. [8218] The Sturdivant Appellants timely appealed on January 17, 2013. [8271].

## Statement of the Facts

### A.    The Deepwater Horizon disaster.

On April 20, 2010, a loss of well control and one or more fires and explosions occurred on BP's Deepwater Horizon oil rig, which had been engaged in drilling on the Outer Continental Shelf off the coast of Louisiana. [8217 at 1-2] The explosion and fire caused the death of 11 aboard the vessel and the injuries of many more.

[12-00968, Dkt. 1 at 13] The Deepwater Horizon sank to the ocean floor two days later. *Id.* Oil poured into the Gulf of Mexico at an estimated rate of 4.2 million gallons per day, covering an area wide enough to be visible from outer space, and continuing for three months before the well was capped in July 2010. [*Id.* at 13-14]

The crude oil devastated shoreline ecosystems. More than that, it contained several volatile and toxic chemicals that were dispersed by windblown air, reaching communities far removed from the spill. [*Id.* at 15] Exposure to such airborne chemical compounds has been linked to a plethora of ailments, including leukemia amongst other fatal, chronic, and latent developing conditions. [*Id.*]

The spill engendered a massive clean-up project implemented by BP. [*Id.* at 16-17] In the process of attempting to dissipate the crude oil, BP introduced a highly toxic dispersant called Corexit into the shore areas, which potentially contains carcinogenic compounds itself. [*Id.* at 17-18] Additionally, other dispersants used in the clean-up efforts are known to cause other significant deleterious health efforts. [*Id.* at 18-19]

Clean-up workers were exposed to oil and harmful dispersants, as were residents of proximate Zones A and B. [*Id.* at 22] "The negative health caused by the exposure to oil, dispersants, and/or some mixture of the two are varied and can cause a wide range of diseases and conditions. Some of these diseased, conditions and symptoms may be evident immediately or within several days, and others can appear months or years later." [*Id.*]

BP soon established a voluntary compensatory program known as the Gulf Coast Claims Facility ("GCCF") under the leadership of respected and experienced claims administrator Kenneth Feinberg. [10-7777, Dkt. 101 at 17] BP acknowledged its responsibility in connection with the Deepwater Horizon incident and pledged to "pay all legitimate claims in an efficient and fair manner." *See*

Statement of BP Exploration and Production, Inc. [559]. In addition to compensation for economic loss, the GCCF paid compensation to class members arising out of personal injury claims. *See* 6427-1 § I.B.5 (excluding from the class definition those who had released, through the GCCF, their claims against BP relating to illnesses or injuries allegedly suffered as a result of oil exposure). An audit conducted by the Department of Justice found that the Feinberg GCCF issued $6.2 billion in claims, an underpayment by only $64 million, barely 1% of the tremendous volume of payouts. [10-7777, Dkt. 101 at 1]. And BP quickly moved to rectify the small number of underpayments. *Id.* The GCCF ultimately was supplanted by the conjunction by the two settlements of this MDL: the economic and property damage settlement and this medical benefits settlement. [Dkt. 6430-1 § 4.2 *et seq.*]

## B.    The Complaint and Settlement.

The Deepwater Horizon Incident gave rise to hundreds of lawsuits for claims alleging both personal injury and property loss. [12-00968, Dkt. 1]. A few months after the federal actions were consolidated the Eastern District of Louisiana, the district court appointed the members of the PSC on October 8, 2010. [506]. The PSC's charge was extremely broad. *Inter alia*, it was to "explore, develop and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation." [506 at 4].

In 2011, the district court partially granted BP's motion to dismiss the PSC's B3 Master Complaint, which included "all claims for personal injury and/or

medical monitoring for exposure" as a result of the Deepwater Horizon events. September 30, 2011 Order and Reasons as to Motions to Dismiss B3 Master Complaint [4159]. The PSC engaged in negotiations with BP over approximately ten months beginning in 2011. [8217 at 4]. An agreement was reached under which the PSC filed an operative complaint asserting several personal injury claims under maritime law on behalf of the class members in this settlement. [12-00968, Dkt. 1, at 32-39].

Settlement occurred before there was any motion for class certification. Immediately after the MDL consolidation, the district court suspended operation of the Local Rule requiring a certification request within 91 days of filing a class action complaint. [4]. The settlement class encompasses three distinct subgroups: 1) "clean-up workers" between April 20, 2010 and April 16, 2012; 2) those who resided in "Zone A" (specified beachfront areas) for some time on each of at least sixty days  between April 20, 2010 and September 30, 2010 and have had a "Specified Physical Condition" prior to September 30, 2010; and 3) those who resided in "Zone B" (specified wetlands) for some time on at least sixty days between April 20, 2010, and December 31, 2010. Settlement § I.A. [6427-1 at 6] Various subgroups are excluded from this general definition. Settlement § I.B. [6427-1 at 6]

The Settlement's terms are intricate, but fundamentally, there are two benefits afforded the medical settlement class: 1) a compensation program for specified medical conditions with claims paid according to a coarse matrix

involving several factors; and 2) a medical monitoring program that allows class members periodic access to seven medical consultations over the twenty-one year life of the program. Settlement §§ VI, VII [6427-1 at 41 and 45] The settlement also provides a third non-class benefit through the creation of the $105 million Gulf Region Health Outreach Program. Settlement § IX [6427-1 at 71]

Per the fee compact, class attorneys would be entitled to request $600 million in fees and costs; BP provided "clear sailing" (*i.e.*, its agreement not to oppose the request). [2427-21 at ¶2] Any amounts not awarded to the class attorneys would be retained by BP. *Id.* Class counsel secured pre-payment of $75 million even before final approval was granted. *Id.* at ¶4(a).

Class members would release all personal or bodily injury claims, loss of consortium claims arising out of personal or bodily injury claims, increased risk claims, medical monitoring claims. Settlement § XVI [6427-1 at 103]. Further, they release claims based on later-manifested physical conditions, if they do not both submit a notice of intent to sue within 4 years of the first diagnosis and adhere to the myriad procedures set forth in the settlement restricting back-end litigation in various ways. Settlement §§ VIII.G [6427-1 at 63] XVI.B.1-2 [6427-1 at 105] Notably, the back-end litigation option, as contemplated by the settlement, limits class members from bringing claims other than compensatory damages. Settlement § VIII.G.2.b-c. [6427-1 at 63] Moreover, the process compels mediation and then restricts litigation timing, venue, use of the class action device, the issues that can

be litigated, and discovery. Settlement § VIII.G [6427-1 at 63] The Class Notice describes these as "certain restrictions."[2] Settlement § VIII.G.1.b. [6427-1 at 90]

## C.    The Sturdivant Appellants object and the court overrules the objection.

Class members Mike and Patricia Sturdivant, and Susan Forsyth were each Floridian Zone A Residents who developed one or more specified conditions between April 20, 2010 and September 30, 2010. [7233 at 2, 5]. James Kirby IV was a clean-up worker who developed one or more specified conditions. *Id*. at 5.

They filed their timely joint objections on September 10, 2012, maintaining that the class could not be certified under Rule 23. [7233, Case No. 10-7777, Dkt. 124]  Further, they objected that even if the class was certifiable, the settlement could not be approved under Rule 23(e)(2) for numerous reasons, *inter alia*, the utilization of a *cy pres* award and the arbitrariness of the claimant matrix. *Id*.

The district court held a fairness hearing on November 8, 2012, and overruled all objections in written order dated January 11, 2013. [8217]. The Court finalized its earlier preliminary certification of the class under Rule 23(b)(3), holding that all the prerequisites of 23(a) and (b) were satisfied. [*Id.* at 33-59]. In doing this, it relied heavily on the legal exegeses of several law professors who had submitted expert reports on behalf of the settling parties. [*Id.* at 35, 37, 38, 39, 40,

---

[2] Remarkably, the Class Notice also delineates the Back-End Litigation Option to be a "Fourth Benefit," but properly viewed, it operates not as an independent benefit to the class, but as a limited exception from the release of claims granted to the defendants.

41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 55, 56, 57, 58] (citing Declarations of Klonoff, Coffee, Miller and Issacharoff). Then, the court approved the settlement as fair, reasonable and adequate. [*Id.* at 59-70. It mooted the 23(h) fee objection by declaring that "class counsel will file a fee petition that class members will be free to contest under Rule 23(h)." [*Id.* at 19. Lastly, the court addressed and rejected specific objections. *Id.* at 71-90.

The Sturdivant Appellants filed their notice of appeal less than a week later. [8271].

## Summary of Argument

Everyone wants resolution, settlement, an end to litigation hostilities, and the opportunity to begin a new chapter. But closure cannot be achieved through any class action certification or settlement that takes unwarranted shortcuts through the protective prescriptions of Rule 23. This is *the* lesson of Supreme Court class action jurisprudence of the past twenty years. *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (Ginsburg, J.); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (Souter, J.); *Wal-Mart Stores, Inc. v. Dukes*, 135 S. Ct. 2541 (2011) (Scalia, J.). It is also the lesson of Fifth Circuit jurisprudence, which has repeatedly rejected improper attempts to bypass certification requirements in the mass tort context. *See, e.g., Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554-55 (5th Cir. 2011) (Clement, J.); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010) (King, J.); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) (Davis, J.); *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)

(Smith, J.); *In re Fibreboard Corp.*, 893 F.2d 706, 710 (5th Cir. 1990) (Higginbotham, J.); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1032-1034 (5th Cir. 1985) (Gee J., concurring) (foreshadowing *Amchem* and discussing the problematic nature of mass tort class litigation).

The prerequisites of Rule 23(a) and (b) and the jurisprudence surrounding those specifications are "designed to protect absentees by blocking unwarranted or overbroad class definitions" and "demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 796 (3d Cir. 1995) *("The Rule 23(a) class inquiries (numerosity, commonality, typicality, and adequacy of representation) constitute a multipart attempt to safeguard the due process rights of absentees.").*

Here, these Rule 23(a) and (b) prerequisites preclude certification of this diffuse and disparate class that includes members who have manifested injury, will later manifest injury, and will never manifest injury, all in individualized permutations. These prerequisites safeguard the Gulf Shore resident class members who have already been diagnosed with the most severe chronic conditions as a result of chemical exposure and assure that they will not have their claims waived in exchange for a scant $36,950 maximum compensatory payment under the scythe of the settlement's claims matrix. These prerequisites prevent an ocular condition from being treated as a respiratory condition, a dermal condition from being treated as a neurological condition, pursuant to the this proposed settlement. These

prerequisites vouchsafe the claims of the clean-up worker who discovers he has cancer in twenty years, freeing him from the rights waivers in the settlement's cumbersome back-end litigation option. The common interests of the class in "achieving a global settlement" do not override these inherent intra-class conflicts. *Ortiz*, 527 U.S. at 858; *Amchem*, 521 U.S. at 625-28 (1997).

The settlement's terms bring the latent and pervasive intra-class conflicts to the fore. But beyond the lack of adequate representation, the lack of typicality, commonality, predominance and superiority, the settlement itself is substantively unfair and troubling. In contravention of *Klier*, it employs a *cy pres* remedy that benefits the Gulf Region community through expanded physical health service and access for underserved communities, expanded mental and behavioral health services, a training program for health workers, and increasing environmental health education (including a outreach program library). But the Gulf Region community at large is not a class entity, nor the client of putative class counsel. The settlement's claims matrix caps payouts to actual class members, while simultaneously establishing a $105 million Gulf Region Health Outreach Program funded from a segregated fund and a $600 million segregated fee fund.

Plaintiffs' expert below estimated a combined benefit of $7.8 billion from the combination of the terms of the PSC's contemporaneously-filed economic and property settlement and the medical benefits settlement [Klonoff Report Dkt. 7116-2, at 45-47]. Notwithstanding the cardinal error of calculating value based on

the cost to BP,[3] there is another issue. None of the guaranteed outlays ($2.3 billion Seafood Compensation Program, $57 million Gulf Coast publicity campaign, $105 million Gulf Coast Health Outreach Program, $5 million supplemental publicity fund) are direct benefits to the medical benefit class. Rather they are notice, administration and prophylactics programs that may not yield any benefit to the very class members who are releasing claims. The benefits to the medical class are purely contingent on the number of claimants who come forth and type of injury that they have incurred.

The settlement was approved without consideration of the actual recovery of medical benefits class members. *See In re Baby Prods. Antitrust Litig.,* 708 F.3d 163, 174 (3d Cir. 2013) (reversing final approval of settlement where the district court did not affirmatively seek out information that would enable it to estimate what class distributions would result from the claims process); *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 944 (9th Cir. 2011) (district court committed reversible error failing to make any findings calculating the "value of benefits to the class."); *Strong v. BellSouth Telecomms.,* 137 F.3d 844, 850 (5th Cir. 1998) (endorsing consideration of the number of actual claims made where there is no firm outlay to the class). In sum, there was no assurance that medical

---

[3] "[T]he standard [under rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 944 (9th Cir. 2011) (quoting *In re TD Ameritrade Accountholder Litig.,* 266 F.R.D. 418, 423 (N.D. Cal. 2009).

benefit class members were the "foremost beneficiaries" of the settlement. *Baby Prods.*, 708 F.3d at 179.

For each of the above independent reasons, the judgment below must be vacated; due to the certification issues, the class must be decertified.

## Argument

## I. The Certification of the Medical Benefits Settlement Class under Fed. R. Civ. P. 23(b)(3) was error.

**Standard of Review:** A district court decision to certify a class reviewed for abuse of discretion. *M.D. v. Perry*, 675 F.3d 832, 836 (5th Cir. 2012). "A district court abuses its discretion, *inter alia*, when it 'rests its legal analysis on an erroneous understanding of governing law.'" *Katrina Canal Breaches*, 628 F.3d at 191 (quoting *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 306 (5th Cir. 2007)). Whether the district court applied the correct Rule 23 framework and legal standards is reviewed *de novo*. *M.D.*, 675 F.3d at 836.

"[I]t is the party seeking certification who bears the burden of establishing that the requirements of Rule 23 have been met." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554-55 (5th Cir. 2011) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 3339 F.3d 294, 301 (5th Cir. 2003)); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). It is the district court's "duty under Rule 23 of the Federal Rules of Civil Procedure to protect absent class members and to police class action proceedings." *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). This is especially so in settlement-only certifications,

where oversight is necessary to "protect the rights of absent class members whose interests may be compromised by the settlement." *Ibarra v. Texas Employment Comm'n,* 823 F.2d 873, 878 (5th Cir.1987).

Rule 23(a) requires the parties to establish each of the following facts:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class. [Fed. R. Civ. P. 23(a)(1)-(4)]

Of the four 23(a) prerequisites, only (a)(1) numerosity is satisfied.

Certifying under subsection (b)(3) further requires demonstration that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Again, the district court erred in concluding that both  the predominance and superiority prongs of (b)(3) were satisfied.

## A.    Commonality Is Absent

As this Court has noted, the Supreme Court's 2011 decision in *Wal-Mart* marked a sea change in the law of commonality and repudiated the Fifth Circuit's former standard for commonality. *M.D.*, 675 F.3d at 839-40. The bygone lenient (a)(2) standard simply required "at least one issue, the resolution of which will affect all or a significant number of class members." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999). Post *Wal-Mart*, however,

commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *M.D.*, 675 F.3d at 840 (quoting *Wal-Mart*, 135 S. Ct. at 2551) (internal quotation omitted). "This does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart*, 135 S. Ct. at 2551.

The problem here is that class members have been injured in unique and disparate ways, they have not "suffered the same injury" even though they may have all "suffered a violation of the same provision of law." The district court fell right into this pitfall, explaining class common questions in terms of BP actions and BP liability, in terms of the "common legal framework of general maritime law". [8217 at 36-37].

It is indisputable fact that the medical benefits class members have suffered harm in myriad ways. This is best evidenced by the fact that the settlement utilizes a 14 page claim matrix to calculate payouts based on numerous factors: type of injury, severity of injury, length of injury, bodily system affected, source of exposure to chemicals, status as a clean-up worker or resident, type of proof of injury, and whether there is an enhancer for hospitalization. There are also geographic dissimilarities between class members, occasioning the detailed description of zones A and B consumes 17 pages. There are also temporal dissimilarities to class claims: exposure happened at different times over a period of months (years including clean-up workers exposures); manifestations of injury or disease may occur immediately, decades later, or never at all.

The district court elided the "same injury" requirement by analyzing the "injury" at the unnaturally high level abstract notion of "suffer[ing] past exposure to essentially the same substance." *Id.* at 39. "The requirements of Rule 23(a) cannot be waved away by artful characterization." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).

Putting to one side the fact that the exposure was to several various chemicals, the settlement terms themselves belie the idea that mere exposure is the "injury." If exposure is the injury, then why is there no compensation for those who have suffered only exposures without any accompanying manifestation of a specified physical condition?

Moreover, the common questions that matter for determining commonality and cohesion are those "that qualify each class member's case as a genuine controversy." *Amchem*, 521 U.S. at 623. There is considerable doubt that exposure alone is sufficient to overcome the threshold for Article III standing. *See, e.g.*, *Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 611-12; *In re Asbestos Litig.*, 90 F.3d 963, 1015 (5th Cir. 1996) (Smith J., dissenting) ("The majority's decision to affirm certification in this case, however, obligates it to address *sua sponte* if necessary the troubling jurisdictional problems raised by the district court's approval of the settlement."); *Georgine v. Amchem Prods.*, 83 F.3d 610, 635-38 (3d Cir. 1996) (Wellford J., concurring) (finding an Article III impediment to exposure-only class members).

Abstracting to this degree is akin to the exact analytical efforts rejected in *Wal-Mart* and *M.D.* Just as Title VII injuries can occur in varied ways (*Wal-Mart*), and injuries from a dysfunctional foster care system can occur in varied ways (*M.D.*), personal injuries suffered here occurred in varied ways. Some injuries here manifest immediately after the oil spill itself or from the clean-up. Some will manifest years later. Some resulted from exposure to chemical X, some from chemical Y, some from chemical Z. Even as to the exposures themselves, they occurred at different locations, in different states, at different times.[4] Even according to the parties, the "Deepwater Horizon Incident" is at least six discrete events. *See* Settlement § II.X(i)-(vi) [Dkt.6427-1 at 14] (defining "Deepwater Horizon Incident").

As in *M.D.*, the devastating error here was failing to "'focus' on dissimilarities among the proposed class members 'in order to determine whether there is even a single common question.'" *M.D.*, 675 F.3d at 841 (quoting *Wal-Mart*, 135 S.Ct. at 8556). "What matters to class certification…is not the raising of common 'questions'—even in droves— but, rather the capacity of a class wide

---

[4] Notably, the district court in *Amchem* also relied upon the commonality of the "exposure" question. 521 U.S. at 623. Justice Ginsburg's opinion held that even assuming that it satisfied commonality, such an issue would not satisfy (b)(3) predominance: *"Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard."* *Id.* at 624. *See infra* §I.B.

proceeding to generate common *answers*.... Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 135 S. Ct. at 2551 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). The dissimilarities in the type, kind and magnitude of injury suffered by medical benefit class members undermines the ability to generate any common answer via a class proceeding.

**B.     Predominance Is Absent.**

"Even if Rule 23(a)'s commonality requirement may be satisfied by…shared experience, the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 623-24. *Accord Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601-02, 603 (5th Cir. 2006). "The predominance inquiry requires that questions of law or fact common to members of the class predominate over any questions affecting only individual members." *Steering Comm.* 461 F.3d at 601. The "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

Here, predominance is simply impossible to meet. Someone injured from the drilling platform accident has a completely different cause of action from someone suffering injury from the chemicals used in the cleanup: not just the completely different damages calculation and potential individualized issues of specific causation, but a completely different theory of negligence or punitive damages, and a completely different theory of general causation. The only similarity is that BP is a defendant in both cases, but by the parties' theory of predominance, the injury

class could include a pedestrian hit by a BP executive's car while they were attending a court hearing on this litigation.

The court below focused on the fact that this case involved a mass disaster that "can be traced to a single root" in a "single location." [8217 at 50]. But "the causal mechanism for plaintiffs' injuries—alleged exposure or fear of exposure to toxic substances—is not so straightforward." *Steering Comm.*, 461 F.3d at 603. The Sturdivant Appellants explained how this analysis—premised on the idea that BP's conduct did not vary within the class and offered by the plaintiffs in their final approval papers—was irreconcilable with binding Fifth Circuit law. [10-7777, 124 at 17-19].

Although generally applicable conduct is likely *necessary* to a finding of (b)(3) predominance as well as (a)(2) commonality, it is not *sufficient*. The general rule is this:

> "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits." [*Steering Comm*, 461 F.3d. at 604 (quoting Advisory Committee's Note to Fed. R. Civ. P. 23(b)(3) and citing *Castano*, 84 F.3d at 745 n.19; *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 627-28 (3d Cir. 1996); *In re Am. Medical Sys.*, 75 F.3d 1069, 1084-85 (6th Cir. 1996)).]

In *Steering Comm.*, this Court rejected certification of a class of individuals allegedly exposed to toxic smoke from fire at a chemical plant. Significantly, "it [was] clear from the record that the damages claims [were] not subject to any sort of formulaic calculation." 461 F.3d at 602; *accord Comcast Corp., v. Behrend*, 133 S.Ct. 1426, 1433 (2013) (without a methodology to calculate damage measurement, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."). So too here, where the damages claims are individualized and not subject to any sort of meaningful, organic, formulaic calculation. Instead, there is merely the artificial and procrustean matrix designed by the PSC. Where "each individual plaintiff suffer[s] different alleged periods and magnitudes of exposure and suffer[s] different alleged symptoms as a result" certification is inappropriate. *Steering Comm.*, 461 F.3d at 602.

*Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011), reaffirmed *Steering Comm.* There the district court certified a class of persons exposed to petroleum coke dust from a single release a refinery. The Fifth Circuit reversed the district court's certification, again relying on the Advisory Committee's Note which explains that "A 'mass accident resulting in injuries to numerous persons is ordinary not appropriate for a class action…" 637 F.3d at 556. Accordingly, despite the common issues of fault, negligence, and punitive damages, certification here was not appropriate.

Confronted with these single-incident mass-tort situations where predominance was not satisfied, the district court concluded summarily that "These

objections are incorrect as a matter of law, and are overruled. [8217 at 50]. Later, the court distinguished *Steering Committee* because the class there brought emotional injury claims in addition to personal injury exposure claims. *Id*. at 55. But the issue of emotional injury claims was ancillary to the predominance principle underlying *Steering Committee*. Rather, that animating principle was that the plaintiffs "had failed to demonstrate that the class issue of [defendant's] negligence or strict liability predominates over the vastly more complex individual issues of medical causation and damages." *Steering Comm.*, 461 F.3d at 603.

And contrary to the decision below "the fact that the Parties have reached a class settlement" does nothing to display the salient cohesiveness demanded under (b)(3). *Contrast* [8217 at 51] *with Amchem*, 521 U.S. at 620 (expressing need for "undiluted, even heightened attention" to certification criteria in settlement context); *Ortiz*, 527 U.S. at 844 n.20. "Proposed settlement classes sometimes warrant more, not less, caution on the question of certification." *Amchem*, 521 U.S. at 620 n.16 (citing *Georgine v. Amchem Prods.*, 83 F.3d 610, 626-35 (3d Cir. 1996)).

*Amchem*, consistent with the Advisory Committee's "call for caution when individual stakes are high and disparities among class members are great," concluded that a putative class of mass tort victims failed to satisfy (b)(3) predominance. *Amchem*, 521 U.S. at 624. *Amchem*'s reasoning can be imported almost seamlessly to the facts of this case. Predominance is not satisfied when

"[c]lass members were exposed to [different toxic chemical compounds], for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only [superficial damage], while others suffer from [severe and chronic ailments]…Each has a different [health history], a factor that complicates the causation inquiry. The exposure-only plaintiffs especially share little in common with each other or with the presented injured class members. It is unclear whether they will contract [an oil-related disease] and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories" *Id.* (quoting *Georgine*, 83 F.3d at 626).

In response to *Amchem*, the plaintiffs below argued that single event, as opposed to multi-event, mass tort actions, especially environmental disasters can be certified. Although this may well be necessary to a finding of (b)(3) predominance, it is not sufficient. As noted above, Fifth Circuit rejected that precise argument in *Steering Committee*. *Steering Comm.*, 461 F.3d at 603 ("[A]lthough the alleged cause of the injuries is also a single accident—a refinery fire—the causal mechanism for plaintiffs' injuries—alleged exposure or fear of exposure to toxic substances—is not so straightforward. While it is certainly true that the cause of the fire itself is an issue common to the class, each individual plaintiff must meet his or her own burden of medical causation, which in turn will depend on any number of the factors enumerated by the experts who testified at the class certification hearing."). At odds with the facts of the complaint, the district court found that the "disparities…of concern in *Amchem* are absent here." [8217 at 51]. The complaint contemplates medical conditions lying dormant until far in the future. [12-0968,

Dkt. 1 ¶¶38-40, 51] (describing mutagenic and carcinogen effects of chemicals at issue). And the settlement contemplates it as well. *See* Settlement § VIII [6427-1 at 63] (implementing back-end litigation structure for "later-manifested physical conditions).

In support of this mass tort certification, the plaintiffs below mustered only a single citation from the Fifth Circuit: *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022-23 (5th Cir. 1992). (cited by final approval opinion, [8217 at 37-38, 54]). Plaintiffs failed to tell the district court and the district court failed to note that *Watson* was vacated when rehearing *en banc* was granted. 990 F.2d 805 (5th Cir. 1993). Accordingly, the Fifth Circuit has subsequently noted that "the panel opinion in *Watson* has no precedential weight in this circuit." *Castano*, 84 F.3d at 740 n.12. Moreover, not only has it no precedential weight, the Fifth Circuit no longer finds its reasoning persuasive in light of developments in class action law. *See Madison*, 637 F.3d at 556 ("Whether *Watson* has survived later developments in class action law—embodied in *Amchem* and its progeny— is an open question…"). Any reliance on *Watson* is severely misplaced, thus leaving the parties without a single precedent from the Fifth Circuit that could justify a sprawling mass tort class action of this type.[5]

---

[5] The district court certification in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) has since been confined to circumstances in which "all or the great majority of plaintiffs were out of the area due to evacuations made necessary by Hurricane Katrina when the spill occurred," circumstances not present here. *Braud v. Transp. Servs. of Ill.*, 2009 U.S. Dist. LEXIS 66400 (E.D.

The consensus against mass-tort personal-injury class actions is so weighty that it spawned the present generation of non-class aggregation litigation. *See* Thomas E. Willging & Emery G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation after Ortiz*, 58 U. KAN. L. REV. 775, 806 (2010)*; see also* Alexandra N. Rothman, *Note: Bringing an End to the Trend: Cutting Judicial "Approval" and "Rejection" out of Non-Class Mass Settlement*, 80 FORDHAM L. REV. 319, 324 (2011) (citing *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 239 F.R.D. 450, 460-63 (E.D. La. 2006) (denying class certification under Rule 23(b)(3) because common issues of fact did not predominate) and Martin L.C. Feldman, *Predominance and Products Liability Class Actions: An Idea Whose Time Has Passed?*, 74 TUL. L. REV. 1621 (2000) (noting the resistance to certification under Rule 23(b)(3) for products liability cases)). "This progression away from the class action, particularly in the context of mass torts, is an oft-told story." Rothman, *supra*, at 327 n.53; *see also* Deborah R. Hensler, *Has the Fat Lady Sung? The Future of Mass Toxic Torts*, 26 REV. LITIG. 883 (2007) (discussing the rising future in non-class aggregative disposition of mass toxic torts in lieu of class actions).

To hold that the teaching of *Amchem* does not apply because the exposures here happened over the course of months, rather than years, and because the exposures are confined to five states rather than the entire country [8217 at 51]), is

---

La. July 22, 2009). But we suggest, in any event, that even that narrow interpretation of *Turner* is incorrect.

to say that common themes predominate in the books of one's local library, because that library is not as big as the Library of Congress. But such reasoning is pure fallacy; in neither library, local nor Congressional, do common themes predominate over individual ones. Likewise, in neither *Amchem* nor this case do common questions predominate over individual ones. *Amchem* was not a close case, and neither is this one.

**C.     Adequacy and Typicality Are Absent.**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(4) requires that "the representative parties will adequately protect the interests of the class." "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members. *In re Am. Medical Sys*., 75 F.3d 1069, 1083 (6th Cir. 1996). These representative requirements are rooted in constitutional due process concerns because of the preclusive effect of a class action judgment or settlement. *See Hansberry v. Lee*, 311 U.S. 32 (1940).

In the Fifth Circuit, "the adequacy requirement mandates an inquiry into 1. the zeal and competence of the representatives' counsel and . . . 2. the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees. The adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to

represent." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-480 (5th Cir. 2001) (internal quotations, citations and footnotes omitted).[6]

Uncovering conflicts of interest is key, for "intraclass equity" is a "requirement in any class action settlement. *Ortiz*, 527 U.S. at 863; *Langbecker*, 476 F.3d at 316 n.28 ("[I]ntraclass problems can present problems of constitutional magnitude.").

As a first principle, it is "altogether proper" to conduct a "close inspection" of the terms of settlement when evaluating whether adequacy is met. *See Amchem., v. Windsor*, 521 U.S. 591, 619-20 (1997); *accord Radcliffe v. Experian Info. Solutions*, __F.3d__, No. 11-56376, 2013 U.S. App. LEXIS 7932, at *20 (9th Cir. Apr. 22, 2013) ("[O]ur [23(a)(4)] analysis focuses on the agreement."). Unless the stakes are "modest[]," a settlement paying differently situated class members the same is a "defect" creating an unsupportable intraclass "conflict of interest." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (citing *inter alia Amchem*).

Adequate representation requires "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627. As Judge Smith noted in dissent in *In re Asbestos Litigation*, "[a] representative must 'possess the same interest and suffer the same injury as the

---

[6] Furthermore, in 2003, Rule 23(g)(4) was added to cement the idea that class counsel has an independent duty to adequately represent the class, beyond that of the named representatives. *See* Fed. R. Civ. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class.").

class members' and must be aligned in interest such that no conflicts exist between the representative and any 'discrete subclasses' within the broader class he purports to represent." 134 F.3d 668, 677 (5th Cir. 1999) (quoting *Amchem*). That dissent was vindicated by the Supreme Court, which reversed. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). According to the Federal Judicial Center's MANUAL FOR COMPLEX LITIGATION, the critical element of adequate representation is that the class representatives and Class Counsel fairly and adequately represent the interests of all subgroups within the class:

> Divergent interests must be taken into account and fairly accommodated before the parties negotiate a final settlement. Consider whether the counsel who have negotiated the settlement have fairly represented the interests of <u>all</u> class members.

MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.612, p. 314 (emphasis added).

If significant differences in interests exist between different groups within the class, the certification must create subclasses, with separate representatives and class counsel for each subclass. *Id*. § 21.23, p. 272; s*ee also Literary Works in Electronic Databases Copyright Litig. v. Thomson Corp.,* 654 F.3d 242, 245 (2d Cir. 2011) ("Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented."). *Ortiz* was unmistakable on this score: "[I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and to claimants not yet

born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel." *Ortiz,* 527 U.S. at 856.

The class here is a behemoth, without any officially designated sub-classes—although certainly possessing several unrepresented sub-classes—guided with only the attorneys of the PSC at the reins. The Settlement Class defines three types of class members:  (1) individuals who worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012, (2) individuals who resided in Zone A [specified Gulf Coast beachfront areas] for some time on each of at least sixty days between April 20, 2010, and September 30, 2010 ("Zone A Resident"), and developed one or more Specified Physical Conditions between April 20, 2010, and September 30, 2010; and (3) individuals who resided in Zone B [specified Gulf Coast wetlands areas] for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident").  Group 2 consists solely of injured class members, but Groups 1 and 3 consist of injured class members, exposure-only class members, and possibly class members that have not yet even been exposed to the oil or dispersants.

Because of factual discrepancies between Groups 1, 2 and 3, and within the groups themselves, adequacy of representation is not possible. The discrepancies spawn individual issues relating to injury and causation as to each individual, and so class representatives' claims are not typical of the class, nor are they adequate representatives for the diverse and inherently conflicted class.

1.     **There Exists an Intra-Class Conflict Between Exposure-Only Class Members and Those Already Manifesting Injuries.**

In both *Amchem* and *Ortiz* the Supreme Court held that mass tort classes fail to satisfy 23(a)(4) when they aggregate in a single class exposure-only class members (potential future injuries) with those who have already display present injury from their exposure. *Amchem* explains why this is impermissible: "Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Amchem*, 521 U.S. at 626. *Ortiz* echoed *Amchem*. 527 U.S. at 856. *See generally* James Grimmelmann, *Future Conduct and the Limits of Class Action Settlements*, 91 N.C. L. REV. 387, 391 n.9 (2013) (compiling tens of commentators addressing the exposure-only class member problem).

The Sturdivant Appellants referred the district court to this shortcoming [7233 at 10-13]. But "[t]he trial court too readily succumbed to Appellees' minimization of the intraclass problems." *Langbecker*, 476 F.3d at 315-16. Attempting to distinguish *Amchem*, the court wrote: "Rather, the Class in this case consists exclusively of individuals who have suffered a past exposure and, by definition, an injury." [8217 at 48]. The problem with such reasoning, of course, is that all class members in *Amchem* **had** suffered the "injury" of past exposure as well. *See Amchem*, 521 U.S. at 623 (noting that the district court had relied upon the commonality that "[t]he members of the class have all been exposed to asbestos products supplied by the defendants . . . ." (quoting 157 F.R.D. at 316)). The

decisive fact in *Amchem* (and here) is that a segment of the class has suffered no manifestation of injury. The purported distinction is illusion.

Moreover, the district court appeared to believe that the Back-End Litigation Option ameliorated any intra-class conflict. [8217 at 48-49]. Not so. First, as described above, the terms of the Back-End Litigation Option are parsimonious and burdensome. *See Supra* at X.

Secondly, a similar argument was made and rejected in *Ortiz* itself. There, the settling parties argued that a comparably restrictive "back-end" litigation option salvaged the settlement. In no uncertain terms Justice Souter responded:

> It is no answer in this case that the settlement agreement provided for a limited, back-end "opt out" in the form of a right on the part of class members eventually to take their case to court if dissatisfied with the amount provided by the trust. The "opt out" in this case requires claimants to exhaust a variety of alternative dispute mechanisms, to bring suit against the trust, and not against Fibreboard, and it limits damages to $ 500,000, to be paid out in installments over 5 to 10 years, despite multimillion-dollar jury verdicts sometimes reached in asbestos suits. [*Ortiz*, 527 U.S. at 847 n.23 (internal citations omitted)].

Likewise, the back-end litigation option here requires claimants to exhaust a forced mediation option, to bring suit against only BP defendants (not any of the other released parties), limits relief to compensatory damages, amongst other restrictions. This Court should countenance no suggestion that future claims are fully preserved.

To the extent that the class could be certified, sub classing was required, with each subclass having "separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 at 856. That is, "reclassification with separate counsel," not merely separate named representatives. *Id.* at 857. *Accord* John C. Coffee Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1443 (1995) ("[P]robably the most disquieting phenomenon about recent mass tort settlements has been the acceptance of a single attorney acting as the representative of multiple subclasses .... Not only have the interests of these subclasses clearly conflicted, but the class counsel has explicitly traded off the interests of subclasses against each other, obtaining substantial compensation for one subclass in return for a waiver of cash compensation by another. In such multiparty negotiations between the defendants and different subclasses of plaintiffs, even the well-meaning plaintiffs' attorney shifts inevitably from the role of an advocate and adviser for clients to the role of a philosopher king, dispensing largess among his client subjects… These intra-class trade-offs are, however, an endemic problem that transcends the asbestos context. Any settlement that awards compensation by disease or injury classification creates potential allocation issues: should the compensation for one subclass be raised and correspondingly that for another lowered?") Not only is the PSC here attempting to represent all the uncertified subclasses within the medical benefits class, its attempting to do that *and* represent the gargantuan economic and property damages settlement class at

the same time.[7] There are layers upon layers upon layers of conflicts embedded in this MDL.

Put simply and more generally, the intraclass equity requirement cannot be met when class members suffered a wide variety of diverse injuries in diverse circumstances. *See Katrina Canal Breaches*, 628 F.3d 185, 193-194 (5th Cir. 2010); *In re Fibreboard Corp.*, 893 F.2d 706, 710 (5th Cir. 1990) (reversing certification of heterogeneous class of "persons claiming different diseases, different exposure periods, and different occupations."). The intraclass conflicts here demand reversal.

> **2.    The Upside-Down Class Representative Selection Procedure Undermined Adequacy and Led to a Settlement Favoring the PSC.**

The "unique" nature of this case trumpeted by the settling parties demonstrates why it is inappropriate to certify as a class action. First, there was a Plaintiffs' Steering Committee; then there were settlement negotiations; and only then did the PSC select class representatives to ratify a *fait accompli*. But a look at the class complaint shows numerous geographically dispersed class representatives who have nothing in common, and likely have never met, were pulled together at

---

[7] In contrast to the medical benefits class settlement members who have maritime claims that can ground an award of punitive damages, a majority of economic loss and property damages class members have only an Oil Pollution Act claim. As the district court ruled, those class members who did not suffer physical damage to a proprietary interest (unless the claim falls under the commercial fisherman exception) have no federal maritime claim. [3830 at 38].

the last minute, yet seek to represent a single class. [12-00968, Dkt. 1 at 3-7]. Given the timing of the negotiations of settlement and fees, it is unlikely that the class representatives played any meaningful role. *See* Settlement § II.DDD [6427-1 at 6] (listing the class representatives as individuals those named in the complaint "or such other or different persons as may be designated by the Court.")  This Circuit requires the class representatives "to be capable of controlling or prosecuting the litigation." *Berger v. Compaq Computer Corp*. 257 F.3d 475, 483 (5th Cir. 2001).[8]  Yet, just as in *Ortiz*, "the named representatives were not even named [until] after the agreement in principle was reached; and they then relied on class counsel in subsequent settlement negotiations." *Ortiz*, 527 U.S. at 857 n.31 (internal citations omitted).

---

[8] How could they possibly be organized enough to do so? *Buettgen v. Harless*, 263 F.R.D. 378 (N.D. Tex. 2009), is relevant. There, as here, the group of class representatives "fail[ed] to present evidence that the group have ever communicated in a meaningful way." Thus, class certification was not possible. If "named plaintiffs are not [talking] to each other, then it is unlikely that they can oversee their counsel independently." Andrew Trask, "Adequacy and Commitment: *Buettgen v. Harless*," McGuire Woods (Sep. 7, 2010). When a group like this set of class representatives is "not cohesive, then it is likely that it was put together by plaintiffs' counsel" to meet litigation objectives, thus "implying that the counsel controlled the plaintiffs." *Id*. When this happens, it makes a mockery of the class action process, and Rule 23(a)(4) adequacy cannot be satisfied: the "willing pawn of counsel" cannot be appointed class representative, because they cannot meaningfully supervise class counsel when they have been handpicked to rubber-stamp class counsel's decisions. *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135-36 (S.D.N.Y. 2008).

The fear is that the class representatives are beholden to, or become agents of, class counsel instead of zealous fiduciaries for class members. *See, e.g.*, *Radcliffe v. Experian Info. Solutions*, __F.3d__, No. 11-56376, 2013 U.S. App. LEXIS 7932 (9th Cir. Apr. 22, 2013) (finding inadequate representation where named representatives' incentive awards were conditioned on support for the settlement); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests."); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 (11th Cir. 2003) ("[C]ourts fear that a class representative who is closely associated with the class attorney will allow settlement on terms less favorable to the interests of absent class members.") (internal quotation omitted).[9]

Immensely favorable to class counsel, the terms of the settlement bear out the inadequacy of the representation. The PSC secured a $600 million unopposed[10] fee request, with an unprecedented $75 million advanced even before

---

[9] BP *had* a highly effective compensation program in the form of the Feinberg GCCF, but the class representatives here eliminated it to rationalize a class action settlement where their attorneys would collect hundreds of millions of dollars of fees.

[10] The clear-sailing clause, by definition, prohibits the defendant from scrutinizing the fee award. The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Weinberger v. Great N. Nekoosa Corp,* 925 F.2d 518, 525 (1st Cir. 1991); *accord In re Bluetooth*

final approval was granted. This $600 million pot was segregated so that any excess in the fee award would revert to the defendant rather than the class.[11]

Oddly, the district court touted the segregated fee fund as a virtue of the settlement's structure. [8217 at 44] ("a unique and valuable benefit to the class"). This "disregard[s] the economic reality that a settling defendant is concerned only with its total liability." *Strong v. BellSouth Telecomms*., 137 F.3d 844, 849 (5th Cir. 1998). "That the defendant will pay the attorneys' fees from its own funds likewise does not limit the court's obligation to review the reasonableness of the agreed-to fees." *Id. Accord In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("[P]rivate agreements to separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."); *accord Bluetooth*, 654 F.3d at 948-49 (same).

---

*Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (considering such a clause one of several "indicia" of impermissible self-dealing).

[11] "[T]he kicker deprive the class of that full potential benefit if class counsel negotiates too much for its fees." *Bluetooth*, 654 F.3d at 949. It "amplifies the danger" that is "already suggested by a clear sailing provision." *Id*. Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, *Lawyer Barons* 522-25 (2011) (same; further arguing reversionary kicker should be considered *per se* unethical).

Also, the district court believed that because the PSC's one-day fee negotiation occurred after agreement on other terms, there was no hint of taint. [8217 at 44, 61]. However, such separation does nothing to allay any conflict unless "fee negotiations [are] postponed until the settlement has been judicially approved, not merely until the date the parties allege to have reached an agreement." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (quoting *GM Pick-Up*, 55 F.3d at 804). Here the consummation of the entire settlement agreement is expressly contingent on "the material term and condition precedent" of reaching an agreement on fees. Settlement § XIX (6427-1 at 121). As such, any notion that BP's reservation price for total liability somehow did not affect the negotiations of the settlement is false.

Meanwhile, the class of medical beneficiaries were guaranteed nothing. Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.71 (2004) ("the fee awards should be based only on the benefits actually delivered."). The burden in proving the quantum of benefit lies with the proponents of the settlement. *Katrina Canal Breaches*, 628 F.3d at 196. They must demonstrably show that the settlement "secures some adequate advantage for the class." *Id.* at 195. But they cannot. On their face the settlement terms are skewed toward assuring that the PSC get its fee award at all costs. It makes one wonder: how much lower of a fee award would have induced BP to allow class members full preservation of back-end litigation rights? If "class counsel agreed to accept

excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class*." Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).[12]

This Circuit has long commanded district courts to "always consider the possibility that an agreement reached by the class attorney is not in the best interest of the class," and beware of settlements which enrich class counsel to a greater degree than they do absent class members. *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978). This is one such agreement, and it reveals the

---

[12] The fact that fees were not be negotiated until after the rest of the settlement makes no economic difference. The settling parties are rational economic actors. Even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount the defendants are willing to pay class counsel. The defendants can further reasonably guess in advance what plaintiffs will demand in the way of attorneys' fees. Because these future fee negotiations are not an unexpected surprise, and because the parties know a settlement will not occur unless the parties agree to an attorney-fee clause, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. "Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 266 (1985); *cf. also Bluetooth*, 654 F.3d at 948 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair).

extent to which the cherry-picked named representatives were unable to supervise the PSC.

### D.     Superiority is Absent.

In addition to a set of predominating common issues and clearing each Rule 23(a) hurdle, a valid (b)(3) certification requires demonstrating that the class action device "is superior to other available methods for fairly and efficiently adjudicating the controversy." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting Fed. R. Civ. P. 23(b)(3)). As with all the rule 23 prerequisites, it is the party seeking certification who bears the burden of proof on the question of superiority. *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004).  "Superiority is inherently a comparative inquiry: the class action must be compared to other options that a government has established to resolve disputes over legal rights. A range of alternatives can exist." Jay Tidmarsh, *Superiority as Unity*, 107 Nw. L. Rev. 565, 578 (2013). Aside from the solitary concern of trial management, which may be allayed through settlement, the other strictures of Rule 23(b)(3) superiority, "designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. *See also Georgine,* 83 F.3d at 617 ("the 23(b)(3) requirements protect the same interests in fairness and efficiency as the 23(a) requirements").

For the following independent reasons the settling parties cannot make the necessary demonstration of superiority in the case at bar: (1) The claims in this

case are of positive, not negative value; (2) Individual issues predominate which cry out for decentralized control of litigation. Likely as a result of both factors, the Fifth Circuit has held that certification of mass tort class actions is disfavored. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.19, 746-47 (5th Cir. 1996).

"The most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case." *Id.* at 748. "A 'negative value' suit is one in which class members' claims would be uneconomical to litigate individually." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 411 n.1. Here, however, as in *Castano*, "there is reason to believe individual suits are feasible." 84 F.3d at 748.

The feasibility of individual suits is evidenced by the fact recitation of the district court. [8217 at 2] ("The *Deepwater Horizon* Incident gave rise to hundreds of lawsuits…"). There should be no dispute here that the central personal injury damages claims of this lawsuit are astronomical and present ample incentive for class members to proceed on an individual basis. *See Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1241 n.21 (11th Cir. 2000) (Tjoflat, J.) (potential "entitle[ment] to substantial compensatory and punitive damage recoveries should they prevail" means that claims are not "negative value"). Even for those class members with meager aggregate damages claims, the ability to seek punitive damages and/or attorneys' fees renders their claims of non-negative value. *Castano*, 84 F.3d at 748. *Compare* [12-0968, Dkt. 1 at 40-41] (seeking punitive

damages and attorneys' fees).[13] Ultimately, *Castano*'s holding is dispositive. When damages are high and punitive damages are available, individual suits are feasible and a class action is not superior. 84 F.3d at 748.

Second, superiority is undermined by the predominance of individualized issues related to the calculation of damages. As explained by *Castano*, "[t]he greater number of individual issues, the less likely superiority can be established." 84 F.3d at 745 n.19. The symbiotic relationship between predominance and superiority undergirds "the general rule" that class action resolution is not superior for dealing with mass torts. *Steering Comm.*, 461 F.3d at 604.

Despite the plaintiffs' emphasis on the "single-source" nature of the Deepwater Horizon incident, the general rule against the superiority of class action resolution of mass torts holds true even when mass torts arise out of a single discrete incident. *Id*. at 602; *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354, 362 (5th Cir. 2008) (*per curiam*) (reversing certification and finding no superiority where "issues of causation and damages are highly individualized" notwithstanding that "the alleged cause of the plaintiffs' injuries is a single incident."). Because putative class members have each suffered damages in unique

---

[13] The district court mischaracterizes the claims as "negative value." [8217 at 2]. This conclusion flies in the face of the complaint and the settlement's terms: including the class definition, compensation matrix, and class release. The claims encompass much more than "conditions arising within 24 to 72 hours of exposure to oil and/or dispersants." *Id*. Regardless, because of the possibility for punitive damages and attorneys' fees, even these would not be "negative value" claims.

and varied ways, geo-spatially and temporally distinct ways, there is no predominance of common issues and likewise no superiority of the class action procedure. *See* Tidmarsh, *supra* 107 Nw. L. Rev. at 588 ("I think it unlikely that most mass tort claims are susceptible to class treatment under a superiority as unity principle…because they are unlikely to involve of a unity of facts, law or remedy (especially in light of individual defenses.").

In this situation, it is only appropriate for individuals to retain full control of their own claims. *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 758 (6th Cir. 2013) (abuse of discretion to find class action superior where there is strong individual interest in controlling litigation). Individual control is even more appropriate, given that BP has already voluntarily acknowledged its responsibility in connection with the Deepwater Horizon Incident and pledged to "pay all legitimate claims in an efficient and fair manner." *See* Statement of BP Exploration & Production Inc. [559]. Thus the only common thread tying class members together, inceptive malfeasance of the defendant, has already been resolved, leaving only individual issues of causation and damages. *See Robertson*, 287 Fed. Appx. at 362 (no superiority when "as far as the issue of liability is concerned, there is simply no gain to be had from using the class action form.")

It is improper to presume that without this certification and settlement there would be judicial meltdown. *Castano*, 84 F.3d at 747 n.24 ("There is reason to believe that even a mass tort…could be managed, without class certification, in a way that avoids judicial meltdown.") (citing *Georgine*). Here, there is no need for

such conjecture even: the GCCF had served as an functioning voluntary settlement program for over a year.  In light of the alternate remedial procedure, there is "the very real possibility that the judicial crisis may fail to materialize." *Id.* at 747.

And even if the plaintiffs' are correct that judicial economy would be served by a global settlement, if there is one principle that can be grokked from *Amchem* and *Ortiz*, it is that efficiency concerns cannot override due process concerns and make an otherwise untenable class a superior solution. [14] To adopt, at this point, a class settlement is not a superior solution for putative class members. Although it surely is superior from the perspective of class *counsel*, fees are a class expense, not a benefit. *In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974) ("Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute."); *Aqua Dots*, 654 F.3d at 752; Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can be a Fair and Efficient Alternative to a Class Action*, 31 REV. LITIG. 617, 635 (2012) ("Class settlements, for instance involve the extra expense of class counsel's fees."). Attorney fees detract from the amount of money available for class members, rather the fund is an honest pure common fund, or a concealed constructive common fund.

---

[14] Anyhow, continued litigation through the back-end litigation option means that the settlement will realize less than complete gains in judicial economy.

In light of the legal claims and factual backdrop of this case, it is clear that a class action is not a superior method of adjudicating the controversies at issue.

For these four separate and independent reasons, it was reversible error to certify the class in this case.

## II.     Preferring *Cy Pres* Recipients to Class Members Is Impermissible.

**Standard of Review:** A district court decision to approve a proposed class action settlement, including a proposed *cy pres* settlement distribution, is reviewed for abuse of discretion. *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012). "By definition, a district court abuses its discretion when it makes an error of law or applies an incorrect legal standard." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). Review of the legal standard adopted is *de novo*. *Id*.

Not only does the heterogeneity of the class dissolve the Rule 23(a) and (b) prerequisites to certification, it ensures that the settlement's terms will be unfair and inequitably slanted in favor of certain class members and against others. The Settlement Agreement cannot and thus does not take into account all the variances amongst class members. The value of each claim, even for the same type of injury, will vary based on a multitude of factors, including the severity of the symptoms, length of the condition, type and cost of medical treatment, and the subsequent

consequences and circumstances of the illness.[15]  The disparities described above,

*see supra* § I, pervade the terms of the agreement and render it unfair.

Beyond the intraclass unfairness though, there is a fatal flaw in the terms of

the agreement: the unnecessary use of *ex ante cy pres*.

---

[15] For example, two otherwise similarly-situated class members with the same injury receive the same payment even if one suffered from the condition for twice as long as the other.

As another example, two otherwise similarly-situated class members with the same injury receive the same payment regardless of the severity of the symptoms.  If one was so sick he or she had to miss work, but the other only suffered mild symptoms and was able to go to work, they still receive the same payment under the Settlement Agreement. The claim payment formulae do not reflect the actual cost of medical treatment (aside from hospitalization costs).  Two otherwise similarly-situated class members with different medical bills receive the same payment under the Settlement Agreement.  For instance, if the circumstances for only one of two otherwise similarly-situated class members required an MRI, those two class members would receive the same payment despite the fact that only one had to pay for an MRI.

Another example is the discrimination in payments between Clean-Up Workers and Residents.  Despite having the same injury, Clean-Up Workers receive higher payments than Residents.

Yet another example of the arbitrary and capricious nature of the claim payment formulas is the complete lack of consideration regarding the waiver of claims for damages for loss of support, services, consortium, companionship, society, or affection, or damage to familial relations.  Claims payments are the same whether the claimant suffered those damages or not, that is, whether the class member is married or single, lives with a family or alone, or otherwise has any evidence of proof of such claims.

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). Imported to the class action context, it has become a increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members. *Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) (Smith, J., *dissenting from denial of rehearing en banc*). An *ex ante cy pres* award can be defined as an award "that was designated as part of a settlement agreement or judgment where: (1) an amount and at least one charity was named as a recipient of part of the fund from the outset and the charity's receipt of the award was not contingent on there being remaining/unclaimed funds in the settlement fund, or (2) the entire award was given to at least one charity with no attempt to compensate the absent class. Martin H. Redish, Peter Julian, & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 657 n.171 (2010).

The $105 million Gulf Health Outreach Program, established by Section IX of the Settlement [6427-1 at 71], is an exemplar of *ex ante cy pres*. It is a four-feature set-aside for institutional grantees in the Gulf Coast region: a $50 million "Primary Care Capacity Project," a $36 million "Mental and Behavioral Health Capacity Project," a $4 million "Community Health Workers Training Project,"

and a $15 million "Environmental Health Capacity and Literacy Project." Settlement § IX.C.2.(a)-(d) [*Id.*]. These institutions are not class members.

The Sturdivant Appellants objected below that *cy pres* is improper when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall. [7233 at 21-22]. § 3.07(a) of the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATION LITIGATION ("ALI PRINCIPLES") succinctly codifies the limitation: "If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members." This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d 468, 474 (5th Cir. 2011) (citing *ALI PRINCIPLES* § 3.07 cmt. (b)).

It was indubitably feasible to distribute the millions of dollars to class members. But rather than negotiate for using the $105 million to compensate class members, through higher matrix payments to those injured, or payments for exposure-only class members, or for a remainder fund to be claimed against in the future, the PSC gave that money away to non-class entities in dereliction of its fiduciary obligations.[16]

---

[16] If it was apathy toward class members or—worse yet—preference for non-class third-parties that drove the decision to prioritize *cy pres* distributions, that casts even further doubt on the adequacy of class representation. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998)

*Cy pres* distributions are non-compensatory, disfavored among both courts and commentators alike, and remain an inferior avenue of last resort. *See e.g., Klier*, 658 F.3d at 475 ("[The *cy pres*] option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly."); *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (*cy pres* settlement can easily become "a paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 103, 1038 (9th Cir. 2011) ("[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the distribution process") (citing authorities); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Cy pres* distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); Redish et al., *Cy Pres Relief and Pathologies, supra*.

Because "[c]lass members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either," "[b]arring sufficient justification, cy pres awards should generally represent a small

---

("The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members."); *cf. also Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 834-35 (9th Cir. 1976) (stating that "a proposed class ... is not a legal entity," and that the "class attorney continues to have responsibilities to each individual member of the class.").

percentage of total settlement funds." *Baby Prods.*, 708 F.3d at 174, 178. But here, the $105 million to *cy pres* recipients is the only guaranteed relief even indirectly targeting the medical settlement class. This does not satisfy *Katrina*'s principle that "the court must be assured that the settlement secures an adequate advantage for the class." 628 F.3d at 195 (quoting 4 Newberg § 11:46 at 133). "A settlement is not fair where all the cash goes to expense and lawyers" and the class members receive a pittance. *Id.* (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 (D. Me. 2003)).

"*Cy pres* distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis*, 858 F.3d at 867. *Cy pres* is improper when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall. The parties violated that last resort rule espoused by ALI PRINCIPLES § 3.07(a) and *Klier*.

The district court affirmed the settlement's use of *cy pres* by noting that the Gulf Region Outreach Program "is in no sense an 'unclaimed' distribution," implying that *cy pres* jurisprudence has no applicability to *ex ante cy pres* negotiated by the settling parties. [8217 at 45] (citing *Klier*, 658 F.3d at 474); *see also* [8217 at 71] (referencing the Sturdivant Appellants' "mistaken belief that the Outreach Program involves a *cy pres* distribution"). Admittedly, *Klier* itself dealt with *ex post cy pres* when a distribution was judicially approved out of leftover and unclaimed funds.

But a footnote in *Klier* contradicts the trial court's conclusions that *ex ante* distributions are not "*cy pres*" and that such awards are entitled to permissive deference. *See Klier*, 658 F.3d at 478 n.29 (observing "the line of authority giving careful scrutiny to class settlement agreements in which the parties agree to a *cy pres* distribution."). The Ninth Circuit's *Dennis* decision—a case argued by the Sturdivant Appellants' counsel of record—is perhaps the best example of "careful scrutiny" into an *ex ante cy pres* arrangement and it postdates *Klier. See* 697 F.3d 858 (9th Cir. Sept. 4, 2012).

Moreover, referring to the settlement payment matrix, the district court suggested that class members were "fully compensated" and that the "compensation available to Class Members for these conditions is uncapped." [8127 at 45]. Compensation is only uncapped in the aggregate. Payments are demonstrably capped as to individual claimants, whose maximum claims are highly regimented according to the guidelines of the matrix.

Legal windfall may constitute a reason to authorize a *cy pres* remedy. *See Klier*, 658 F.3d at 475. But it is mistaken to assert "full compensation" here. Augmenting claimants' distributions would not constitute a legal windfall. Windfall compensation should be determined by comparing the relief obtained to the full measure of legal damages sought in the complaint, not to the agreed-upon payment ceiling of the settlement matrix. *See Klier*, 658 F.3d at 480 ("The fact that the members of Subclass A have received payment authorized by the settlement agreement does not mean that they have been fully compensated."); *cf. also*

*Bluetooth*, 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint). Comparing the relief obtained to the complaint—even a complaint filed contemporaneously with the settlement—one realizes that the payments under the matrix cannot possibly fully compensate each class member. Those class members who suffered toxic exposure without any ensuing symptoms are entitled to nothing, yet this is supposedly the lynchpin of harm holding the class together. As in *Klier*, the personal injury "[c]laimants … have already received some measure of compensation for their injuries, but it is far from full." 658 F.3d at 478.

The bare legitimacy of *cy pres* in the class action context is controvertible with good reason. *See Klier*, 658 F.3d at 480-82 (Jones J., concurring); *In re Pet Foods Prod. Liab. Litig.*, 629 F.3d 333, 358 (3d Cir. 2010) (Weis, J., concurring and dissenting); Redish et al., *supra*; *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012) (collecting sources). Although *cy pres* has been given a narrow berth in the Fifth Circuit, for the foregoing reasons, circuit law requires that this particular application be rejected.

## CONCLUSION

Legally and metaphysically the Deepwater Horizon "incident" is no single incident at all. *See* Settlement § II.X [6427-1 at 14]. In actuality, it is a series of highly intricate events that occurred and are still occurring with respect to thousands of individuals along the Gulf Shore. As precedent amply demonstrates, this case is neither conducive to class certification, nor is it conducive to class

settlement. Certification and settlement approval from below must be vacated and reversed.

Dated:  July 11, 2013          Respectfully submitted,

*/s/ Joseph Darrell Palmer*
Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA 92075
Telephone:  (858) 792-5600
Fax: (866) 583-8115
Email:  darrell.palmer@palmerlegalteam.com

*Attorney for Objector-Appellants Mike and Patricia Sturdivant, Susan Forsyth and James H. Kirby IV*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/          Kirstin Largent

## CERTIFICATE OF COMPLIANCE
## WITH FED. R. APP. 32(a)(7)(C) AND CIRCUIT RULE 32-1

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,429 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font. The footnotes utilize 14-point Times New Roman Font pursuant to 5th Cir. R. 32.1.

Executed on July 11, 2013.

*/s/ Joseph Darrell Palmer*
Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA 92075
Telephone:  (858) 792-5600
Fax: (866) 583-8115
Email:  darrell.palmer@palmerlegalteam.com

*Attorney for Objector-Appellants Mike and Patricia Sturdivant, Susan Forsyth and James H. Kirby IV.*